Revitalizing Auto Communities v. Glocky Martins 2215-89, to start with Mr. Talbert. Good morning, Your Honor. May it please the court. My name is Jeff Talbert and I represent the RACER Trust, appellate as trustee, and RACER Properties LLC. For almost four years, RACER has sought the ability to have its circular section 107 and 113 claims heard so they can obtain reimbursement for past costs as well as contribution for future costs related to work to clean up PCBs and other contaminants in the Lake Creek Watershed, which flows into Onondaga Lake in Syracuse, New York. This is the second time we are before you. The first time, you vacated and remanded the court's dismissal of the complaint based on prudential right to scrap. This time, faced with an extremely detailed amended complaint, 85 pages, the court dismissed all federal claims with prejudice on statute of limitations ground. The court did so by fundamentally misreading the interaction of terms in the 2011 agreement. We believe that the court was so focused on trying to figure out what was included in the agreement that it didn't focus on what was explicitly excluded, and that was in the reservation of rights on paragraph 100 and section 7. In particular, I'd like to focus on two areas where we think that the court went wrong, both analytically and then with respect to the allegations in the complaint. The first begins on the top of page 25 of the court's decision, where it finds that because the reservation of rights itself references the 2011 agreement's covenant not to sue, the scope of the former cannot be resolved without dabbling into the latter. To us, that doesn't make sense because the reservation of rights is an exception that runs through the agreement to each of the operative sections that you would look at. Excuse me, Mr. Talbot, aren't the reservation of rights and the covenants not to sue symmetrical? We believe that the reservation of rights, as is the contribution protection and other sections in the agreement. So explicitly, the covenants not to sue says, subject to the reservation of rights? Yes, that's what I understand. And that's critical, Your Honor, because that reservation of rights, which fits the way that we read this entire settlement agreement, covers all rights with respect to any site that is not a property. There are then claims or causes of action for migration of hazardous substances emanating from a property. So property is a defined term in the settlement agreement. It refers to Attachment A, which is 89 properties that are included. Then there's a recognition. So obviously, in this, the U.S. is carving out any site that is not a property. But if there is a cause of action for migration of hazardous substances, in other words, if the government asserts that there was a migration, doesn't that mean that that claim has been settled? It does. If that claim has been... I mean, you wouldn't have to litigate to determine whether there actually was migration in order to determine whether the claim was settled. That would be sort of pointless, wouldn't it? No, that's right. I mean, but some of this has to be viewed in the same way. So the clear intent seems to be to cover property, but obviously, contaminants don't stop at the property boundary. So there's some natural migration, oftentimes by groundwater. So there is money allocated for that type of migration. What we've alleged in our complaint is that the contaminants or areas that we have been asked to clean up fall well outside of that. But that's the merits of the claim for migration. This agreement, I thought, was designed to settle all claims of migration. Yes, and our allegations are that there are areas where contaminants, where there are potential where we've been asked to clean up, that there is not migration. But you're saying, again, that there is not migration. What if it is alleged that there is migration? In other words, it's not really a settlement. It's a settlement. It doesn't... you don't admit to liability. They don't... but they made a claim that there's migration. Could be migration all over the place. So isn't any claim that sounds in the possibility of leaching or migration of these contaminants from in the groundwater, from the groundwater, down in the stream, settled? Well, and you took certain obligations, and that's... now your liability for any such claim is resolved. Well, we would agree that that this covers migration from the property, right? But that's two components. So first is whether it's a site, whether there's a different site, and whether there's contaminants... Are you claiming that there's a difference between the OU2 and the remaining properties? Is that the basic of your claim? And that the earlier settlements didn't speak to this remaining property, only the 2021 did. That's correct, and that's another fundamental error that we believe that the lower court made. So in our allegations, even if you take as truth the analysis, where you go from the reservation of rights back into the covenant not to sue, into the proofs of claim, and then examine the proofs of claim, those proofs of claim do not cover what we've alleged as the expanded territory. And we've laid that out in paragraph 69 and 70 of our allegations. Do you agree that the proofs of claim that settled sub-site 5, whatever that is? The proofs of claim do, but I do want to point back that the proofs of claim in paragraph 95, where they've mentioned that those claims are addressed, also refers back to paragraph 100, which is the reservation of rights. Which is why I'm pointing out that the U.S. threw in these broad allegations. These are not agreed to, and then they're resolved, but to the extent that they're not covered in the reservation of rights. Well, that means, I'm still trying to go back to what, how to interpret the reservation of rights. The reservation of rights says we reserve the right to sue for anything that's not, that is not because of migration of hazardous substances. Right. So, if they file a lawsuit saying this is the result of migration, that lawsuit would be barred, would it not? Well, that's the question with respect to OU2, and I think you're right when you get into the subsequent settlement agreements. I just want to be very clear that we're separating, we have allegations with respect to the expanded territory that would be completely separate from that. Even if you buy that, we think that the court's analysis on Well, we'll get to the expanded territories, but let's focus on OU2 for a while. Yeah, for OU2, you're correct that if it was deemed that OU2 was not, you know, was from migration, then that would be covered by those agreements. Deemed by whom? Well, that's part of, that's part of the issue, is that, so our expanded territory claims are clear, right? So OU2 ones, I think, are a little more complicated, because there is, we have alleged that there are areas in OU2 that have gone, that were not from migration. Those are subject to Well, maybe you say they're not, but I don't understand how that affects the settlement, because the settlement turns on settling claims that they were. The question here is not what would the merits have been if you had not settled, but had litigated government claims that there was migration all the way down to Syracuse and up to Canada and whatever, that might be wrong. Yeah. But that's not the point. The question is, were those kinds of claims settled? Well, and the, well, I'm going to separate those kinds of claims. I mean, the devil would be in the details, but with respect to OU2, we believe the subsequent 2015 agreement is what resolved the OU2 claims. In fact, it's explicit in that it addressed and addressed the liability there. If you go back to the agreement in paragraph 100, there are exceptions where they reference paragraphs 101 and 102, which would allow the U.S. government to issue orders to address Now, could I go back to the subcite 5 issue? Yes. The district court said that you conceded in a footnote in your brief below that OU2 is subcite 5 or vice versa. Yes. And then explicitly went on to say, and that's not the expanded territories. Correct. Was this court wrong? Was that not a concession? No, it's not wrong. I think what's missing, and I apologize for this confusion, but the way we, it was in the proofs of claim, OU2 was mentioned in the government's proofs of claim. We just don't think, we think that there was a not only those proofs of claim, but the other phraseology within the agreement that relates back to paragraph 100 at section 7. And so, when you get into the field, for example, there was sampling done, and the extent of contamination in OU2 at that point may be uncertain. So the government, we think, reserves the right to address these other areas through subsequent agreement. And could you explain to me, what would there be other than migration? What could the government sue and blame you for that is something different than migration from the property? Yes, and we have, you know, several of those allegations within the complaint, and in several respects. So, again, from a common sense perspective, and the typical usage, you would think of emanating and migrating as something flowing from the property. You wouldn't think of something where someone comes in with a bulldozer and grabs material and then screws it all over different properties. That's an interesting question. What if it was foreseeable that someone might come with a bulldozer? In other words, I think the bulldozer you're referring to is the dredging of Lake Creek? Well, that's, yes. So we have allegations regarding dredging of Lake Creek. But if you pollute Lake Creek, and a government agency, the county, that has responsibility for Lake Creek, decides it would be better to make it deeper and wider, and they come and dig up the bed, they don't know at that point that the bed is all polluted by the gunk that you threw into the stream, right? Well, here's the issue. If you do not, and this is why it does take some factual evaluation, right, in terms of where, not only where material may have gone, but also whose it was. So say you have one molecule, one PCB, you know, molecule that was strewn on another site, mixed with 40 other companies' waste. Does that mean that you have to... But then what would the government be reserving? What can they possibly claim if, in fact, it turns out that the pollutants that are identified at a particular site came from some other place? And if they're coming from you, what does the government still have that they could sue you for? Well, I'll give you an example. So the Brookline properties is a good example of that, right? We allege that there were 19 private homeowner properties. As some of the cleanup work is going on in the creek, and there's an agreement to be done, and there's a hotspot that's found, right? There's no source identification of where that's from or whose it is, other contaminants. And some of this was at depth, such that it reasonably could not be, you know, through what you would think of as emanating or migrating. The state requested that RACER go and address that area. They went and did it. They had basically two options, right? Either to stop and say, wait a minute, that's not us. We're not doing that. That's beyond the scope of what we've been asked to do. Or go and address that area, and then if they think that it was improperly conducted, bring a contribution action or a 107 case. I want to return to that. Whatever you say about these things in O2 and that you would still argue that the related properties are not covered because they're only mentioned in the 2021 settlement, and so that is subject to litigation and not subject to the statute of limitations. So, apart from your argument with Judge Lynch, you would still say that that is not. But why isn't that also covered implicitly by the agreement? Yeah, and I think that with the expanded territory, that was explicitly not covered in the Proofs of Claim. It is, in our view, it involves separate properties. So, what they say was explicitly not covered. One of the things I'm struggling with is the Proofs of Claim describe the areas covered conceptually, right? They don't say meets and bounds. They say these properties, this site, the dredging site, the property downstream. The assertion that they don't, if conceptually the expanded, what you're describing as the expanded territories, fit within that concept, then they were covered within the Proofs of Claim, right? Well, they are admittedly not exact meets and bounds, but we do believe that the way that they are described in those Proofs of Claim is, as we've indicated, Subsite 5 would be consistent with the description for OU2, but if you look at those descriptions, it's decidedly very different from... So, you're saying that even in the Proofs of Claim, there would arise a question of fact as to whether these, and so it's not proper for a dismissal at this stage? Correct, Your Honor. Can I ask a question about naming? It's interesting to me that OU2 is a subsite, is an operable unit of Subsite 1, but yet it's also a Subsite 5 in its own right. Can you have a... I don't understand that. There's a little different, and it's confusing, a little different nomenclature. So, the United States in its Proof of Claim just refers to them as subsites. Those were not official operable units, so at most of these surplus sites, it will take a larger site and then break it up into different operable units. Some of those may be very distinct, and some of those may be the same. I think the Cooper cases both deal with that kind of issue, trying to figure out if it's an adjacent OU, is it really a related property? But here, where we begin, and it's a much larger area. I mean, if you look at what the set-up purpose and the money allocated for these cleanups, if you include these other areas in the expanded territory, and we put a map as Exhibit S, where you can see the delineations of the two that mirror what we've alleged in the complaint, it's extremely expansive and extremely costly. I mean, you're talking about costs that go up to like $93 million. So let me ask about that, because I'm trying to figure out the ramifications if you lose, and you've got this settlement agreement. What in the settlement agreement obligates you to do anything more than expend the money allocated in the settlement agreement for the migrating territory, and what in the settlement agreement would allow the government to come after you for anything more than that, given the release of claims? Good question. So the purpose of this trust, and I can tell you that they take it very seriously, is to try to clean up and then, you know, redevelop these properties, allow them for that. So what has happened in this particular area, unfortunately, is that the core of that mission would be cleaning up the property itself, right? And then other things that, obviously, the migration emanation that we're talking about, but here what's happened is they have gotten so far afield trying to address all these other areas that it's obviously compromised the core. You're right that at the end of the day, it's a trust with limited funds. If they are able to recover costs that other parties have contributed in terms of contamination, that would go back in and be usable for remediation. But if you lose, and you can't go out there and make contributions, the EPA can, right? They can go and they can say, okay, trust is blown into the lawn, and now we're going after GD. They can do that. The problem, and I think the core issue of why we're raising it, is that money that's spent, like, for example, on the expanded territory, that additional approximately 10 million or so, really benefits, you know, polluters who have sent waste to these other areas that that trust had to clean up. Well, Mr. Talbot, I want to ask a question about these sums. I did not think that there was an argument in your brief that you don't have to do any of this because it's going to cost more than the allocated amount. Is there any argument of that sort in your brief? No. Okay, that's the first thing I want. Then I want, excuse me, now I want to ask a different question because what I understood in the last case, when I asked a question similar to Judge Robinson's question, was that we should not treat this agreement as just an agreement about this site, right? The settlement in 2011 is a settlement of all of the government's GM properties nationwide. Is that correct? You're absolutely right. It covered 89 properties. Exactly. And furthermore, it was sort of my understanding, and I could be wrong about this because I'm trying to remember what I thought I was told by somebody in a previous argument, that these estimates for each site are not upper bounds of what the party, what RACER is required or permitted to spend on one of these sites. And I take it that what you've been doing all along must be, since you've already blown the wad, so to speak, is taking money that was allocated in general because you have not just the millions, tens of millions, couple of tens of millions involving this property, you have hundreds of millions of dollars, right, altogether for the entire country. And it is altogether possible that some sites will go over budget, as it were. Other sites will come in under budget. I would think a prudent person would have thought they'll all go over budget, but that's not my problem. I didn't negotiate the settlement. So that those upper boundaries, as I understood it, were just guesses at what all of these things would be. And then you add them up and say, that's how much money the General Motors estate is turning over to the RACER Trust. Do I have that correct or am I totally off-base? So, yes, you're correct in the concept that there are other funds that are, like a cushion fund, emergency fund, that can be drawn upon. And there is a finite amount of funds that would go to all of these 89 properties. So you're kind of, if you spend more on one... You'll spend less on the other. Yeah. Sooner or later, you'll run out of money. Yes. I mean, and to Judge Robinson's question that I didn't answer, but I think it's somewhat related to yours, is in Paragraphs 101, you know, referenced in the Reservation of Rights and 102, the government reserves the right to issue orders to the Trust to do additional work. So, you know, that's what we think happened, obviously, in the 2015 and 2021 context. I can say that the... But the additional work has to be tied to the migration from the properties, right? In other words, the government couldn't come in and say, oh, by the way, there's a site over here that we want you to take care of. I mean, the government does reserve the right in Section 101 and 102 to issue other orders. So that makes the covenant not to sue sort of illusory. It is all subject. I think that's kind of why I was saying, if you look at the covenant not to sue, the contribution protection, even Paragraph 95, where they refer to the purchase of claim, you know, all refer back to that Paragraph 100, which indicates to me that that's where, you know, the crux of the... So let me ask you that, because I agree that Paragraph 100 is the crux, and I heard your argument about migration versus correcting. But when you look at the definition of properties, right? So the reservation of rights is anything that's not a property or migration from a property, the government's reserve its rights, which means the only thing that's being settled is properties and migration from properties. You look at the definition of properties and it refers you to Exhibit A and 89, the list of 89. And you look at the list of 89, and one of the properties identified in the list of 89 is the Lake Creek PCB dredging site. So why isn't your liability for migration in the PCB dredging site established, regardless of whether the dredging interrupted the flow of the molecules from the plant, because you're also on the hoops of this property. Oh, because that's a completely different property. And that is a little bit confusing, that Lake Creek property. And I think the best example, if you take a look at that Exhibit S, where we have the map laid out, you'll see in different colors where each of those areas are and what is part of the description OU2 versus the expanded territory. It will also give you a sense of how much more expansive and how different an area that expanded territory is from the other. Let me just finish this. Is GM's liability... I think I'm misunderstanding the role of... I understood all of the properties that are on that list to be within the scope of the settlement agreement. Yes. All right. And then the covenant not to sue applies to all of those properties. Yes. So why does the fact that it's a distinct property matter for the purpose of our analysis here? Oh, only to contrast the areas outside of that. So if it's a separate property where there was not migration or emanation from a property, that would be excluded. But my understanding is that, at least one of the arguments you made, is that because of the kind of interruptive effect of all the dredging, you can't look at some of the downstream stuff as emanating from the plant because it got spread around by the bulldozers. So I'm still not understanding why we care about that if the dredging site is also a property that the grazer is liable for cleaning up the emanations from that. I think I understand where you're going. So it would be the plant itself, which would be covered. That would be operable unit one. That Lake Creek wetland that you referred to in attachment A would be a separate property. And then you have Lake Creek itself. And then what the allegation is is that Lake Creek was dredged and then material placed in other areas outside of that. And then we also have allegations that as we kind of moved through this, the state identified contamination in even other properties beyond that. Which fits, in the state's view, within the conceptual framework of it migrating from a property that is within the settlement, right? Well, that's... I'm sorry, let me say the state's view. Well, not the state's view. GE's view, I guess, in this case. The defendant's view. Yeah, their view... I think what their view, my understanding, is that they're arguing that the broad language in the matters addressed, saying related to, or so on, would cover any of this. Well, it's not even that, right? It's... I mean, if everybody agrees that the properties and the stuff that migrated from the property is what this settlement covers, no more, no less. Right. And the properties include the Lake Creek dredging site and whatever's emanated from that. Are you saying that you're not... You didn't, through the 2011 agreement, resolve liability as to the dredging site and what emanated from that? No, we did. But I think what we're alleging is that there are properties in other areas that are outside of those two. That are neither of those, that they got there not from, migrated from either of those sites. And the question is, which are those? You say there are those. They say there aren't. And then the question is, even if you are right, which these are, okay? Correct. I mean, it's a factual dispute, then, about some of these areas, but we've definitely pledged... And you claim that being a factual dispute that can't be settled on a dismissal. Correct. And we think that what the lower court did in just taking OU2 and the expanded territory and just saying that there's no distinction between them is contrary to... Let me, again, go back to my very first question to you. I think it was my first question. I think I understand very well what your point is about the expanded territory and the court lumping it with OU2 and that that's a distinct move that has to be justified. And you're saying it's not justified. We'll hear from them about that. But what the court also said was that you conceded that OU2 equals sub-site 5. And it sounded to me as if you were just making an argument that, oh, yeah, but OU2 is not the expanded territory. Granted. Now let's focus on OU2. Is OU2 covered by the settlement? So here's what our position is as it's alleged. And it's a little more confusing than the expanded territory. And I think this is why, is that OU2 as a sub-site was in the proofs of claim as alleged by the U.S. However, if you take a look at paragraph 95, it says, subject to the reservation of rights, we're resolving these proofs of claim. So, again, we think that goes back to paragraph 100. And that, and... You're telling me that if the, okay, and if the government had come in the day after the settlement is signed and said, you know, we're gonna bring a new, completely new action against you based on sub-site 5, you wouldn't have said, what, you're crazy. We settled that. Well, I think, again, for OU2 and the way that that, it's slightly confusing because you have the sub-site and then you have kind of the bounds and that. And I think this was Justice Robinson's point was some of those are slightly vague. So there is material that we would claim, you know, is outside of that that was not from migration that should not be covered under this. It may be vague, but isn't it sort of resolved that OU2 equals sub-site 5? And is that, is that conceded or not conceded? It's not conceded, but I think that is a closer, if you're talking about the spectrum of... Can you explain to me why it isn't conceded by the language that is cited by the district court? Because it seems to me that it says sub-site 5, which is OU2 or vice versa, and then distinguishes that from the expanded territories. Yeah, so we concede that OU5, as it's in the proofs of claim, describes OU2. Yes, certain areas of OU2. But you're saying that that is still subject to, even though we're settling all claims about this site, that does not include claims other than migration? Well, we're not, so if paragraph 95 in the agreement said it resolves all the proof of claims, not subject to anything else, we would say, yeah, I mean, that looks like that was covered. Here, it is still subject to that proof of claim, which we look at all... So then what you would do, I think, is you take all those proofs of claim allegations, and you would look at which ones the U.S. is reserving its rights on or still says are not covered, and that would be if you have a property where there's migration or emanation from that property. And so... I'm still trying to figure out what is settled if to determine the scope of the settlement, you have to determine what your liability would have been by establishing whether the property, the pollution comes by migration from the place where you were dumping. Right, right. What is settled? How is anything at all settled? If that's the way we interpret it. Well, the core of the settlement is the property, right? And then there's probably... But your argument would apply as much to that. So the question is, was there a settlement with respect to at least some things, or was this something which was opened up? So, I don't think so. I'm going to ask a couple more questions. I want to make sure I... The reservations of rights is the key, and I'm still hung up on this. So, am I right that the dredging argument is a little bit off the table because you've acknowledged that the dredging is... the Lake Creek dredging site is a property in its own right, so anything that migrates from that is within the scope of the settlement. Correct. We're not arguing that that's part of this extra. All right. So, my colleague asked you earlier, if the OU2... Let's talk about OU2 first of all. Other than migration from the dredging site or migration from the plant, what's the alternative explanation for the contamination there that causes you to argue that it's not within the description of what was settled as being migrated from the property? Right. So, two things. It would be where there's an intervening cause. Intervening, so we have allegations against individuals that we believe came in, removed material, transported it to other areas or arranged for their disposal, and then they ended up other places. It would also be that there are... So, what other places just help me explain? So, yeah. So, I mean, and that's part of the bounding of this issue, right, is if you take the appellee's view, there really is no boundary. It would be wherever this stuff... But who are the people who came and what did they... Tell me more specifically. Okay. So, there was... There were contractors, right, that dredged the creek and then placed material in various areas. And that was beyond the dredging site? Right. And that was... Correct. Okay. That's right. And then, what we're claiming is that... So, that material, that would be, to your point, the OU2 stuff that we say, wait a minute, you know, migration, but then where there's an intervening action that increases, greatly expands that area, that's not covered. That subject, that is addressed in the 2015 agreement with the state. And is that both the expanded... What you're calling the expanded territory and OU2 that encompasses these places? Right. So, expanded territory that gets even more far afield than where we get into these 19 properties in Brookline and the state is saying, hey, can you address this? And RACER is saying, time out. That's well far afield at this point. And so, one thing that RACER could do... And I want to hear the second... You had two things you were going to tell me, but I'm going to divert you for one second. RACER could, I suppose, say to the government, oh, gosh, no, you're asking us to do things that are far beyond the settlement. And then at that point, it becomes an issue between RACER and the government. And then, depending on how that turns out, that drives this. And it sounds like what you're trying to do is say, look, we're willing to take this on without that fight if we can get contribution from others. Is that your understanding? Yes. That's right, Your Honor. Okay. What was the second I said, what are the explanations for the other places if it wasn't migration from where it was going to be? Yes. And we have, I mean, I think we have like 30 allegations in the complaint about other contributions, many of which from the 40-plus other companies that we brought claims against that, you know, they're material... I mean, one of the contaminants as an example is mercury. There was not mercury on the GM facility It was not sampled. But in these, once you get into these other areas, there's mercury that needs to be cleaned up. Well, that may be a ground for contribution, but am I right that your liability, let's say there's a whole bunch of stuff from lots of people in the banks of the creek, the fact that others, that might be a basis for contribution, but in terms of your liability being settled by the agreement, if some of your stuff is there, that settles it, right? Well, and that's, I think, you know, Lake Creek is a good example where it's emanating and migrating from the property and natural... I didn't raise that, right? It was covered. It's, as you get started getting farther and farther afield and you're being asked to clean up areas that, you know, easily could be, you know, significantly from some other source, you're basically taking funds that were... Well, but if you made that agreement, that's true. That's true, but... So we're back to the question of whether it's in the agreement. If the agreement is that you're liable, even if it is, even if you contributed little, that's it. That's right. Yeah. It's more of an additional argument that you... You're arguing for fairness and so on, but that's, but we're arguing about the agreement. Understood. I thought her question was more factually how could that happen and that's not possible, but we allege. Right, and I, and, and, okay, and the one last question I had is the agreement allocates these tranches of funding and I understand that there's some flexibility, but how do you, how should we think about the fact that the 2011 agreement specifically allocated monies for the downstream migration when we're thinking about your question, your, your, your question is that it didn't resolve OU2 which strikes me as kind of the bankruptcy stream. Yeah, so, so, again, and some of this is getting into that definition of OU2 and what that covered because, so, yes, there is money allocated and it's in recognition I think that there is migration coming from the property that would have, that would have to be addressed, but that area, and you're right, it's not alleged in the proofs of claim, but as we've alleged the boundaries in OU2 go far beyond we believe what was migration and what was, what was delineated. So, we're not saying that there weren't funds allocated for the, for the creek. To make matters complicated, there is a, when you get into the facts, there are, you know, splits for different media, different types of, so groundwater, you know, I'm sure we'll have more questions for you in the near future again. Thank you. Appreciate your patience. Mr. Weigel. Good morning, Your Honors. I'm going to please the Court, Robert Weigel representing Lockheed Martin Corporation in presenting argument for the appellee. The district court  the motion to dismiss by doing something courts do every day. Interpret the terms of a written settlement agreement to determine the scope of the liability and the status of the liability resolved. The CERCLA contribution claims accrue upon entry of a judicially approved settlement agreement resolving a party's liability for the contamination at issue. And here, the 2011 agreement resolved a racer's liability for the contamination at issue in this case. Therefore, the district court correctly held... How did the court look at the proof of claims? How was that part of the argument? They said it was agreement to the agreement but that's nonsense. Now, they don't make that argument. They talk about other reasons why and the reasons they give why the proof of claims shouldn't be included are not very good from my point of view but how on a motion to dismiss did they bring in the proof of claims at all? Now, it may be because they haven't made that argument that that's the end of it but why isn't this something that should have gone to summary judgment rather than dismissal? First, I would just emphasize we think the proof of claim are not essential to it. We think settlement agreement itself is deficient. We think  of claim itself is deficient. But as to why it's appropriate to look at the proof of claim here, I think both because it is properly considered to be incorporated by reference or at least integral to the complaint. The complaint includes as an exhibit the 2011 settlement agreement and federal rule 10 in this court's decision in cases like chambers makes clear that an exhibit to the complaint is part of the complaint for all purposes. So you take the settlement agreement which is part of the complaint and it expressly says in defining the scope of the liability that is resolved that that liability includes the liability that the government asserted against GM in the government's proof of claim. And the covenant not to sue also covers other environmental liabilities asserted in the government proofs of claims. Correct. So the proofs of claims are incorporated by reference in the settlement agreement. And the settlement agreement is not just incorporated by reference but is specifically made a part of the complaint. I think that's exactly right. We cite cases in our brief where the connection is more attenuated than that. You have a document that refers to another document. I'm not sure I buy going that far. But they don't argue to the contrary. And the alternative, Your Honors, I would say it's well established that the court, even if the document isn't incorporated by reference as it is here, if it's something the court can properly take judicial notice of. No, no. If you get your judicial notice, then it's there but it's not there for the truth. So you've got a problem if you're going on judicial notice. You're okay if you're on the basic argument that it was incorporated by reference. And Your Honors, we probably don't dispute that principle at all. I don't believe the district court or this court needs to rely on the truth. In other words, it doesn't matter whether the government was right in the factual allegations it made in the prusive claim. We don't care about that. We can't know about that. The question is what was settled and what's relevant to what was settled is what did they allege. So the prusive claims are being considered only for the fact that they alleged certain things. Now what they did allege and whether even if that is covered by the covenant not to sue, if the covenant not to sue is subject to the reservation of rights, then we go back to the primary argument about the reservation of rights. And your honors, I think that racer's interpretation here is at odds with both the plain language of the agreement, 2011 agreement construed as a whole, certainly when you consider the proof of claim, but we don't think that's necessary. But it's also at odds with a common sense understanding of what the purpose of the agreement is. So paragraph 105 of the agreement expressly states that it is the kind of agreement that triggers a contribution claim under section 113 and also expressly lays out the scope of the agreement, the matters addressed. And it's intentionally broad. It says it includes all costs of cleanup for contamination incurred by the government signatories or any person relating to or in connection with the properties. And I think that that makes sense when you think of the context of the agreement. This is an agreement entered into during GM's bankruptcy. And you say that relating to or connected is enough to go beyond the OU2 to be expanded. Well, Your Honor, I want to emphasize that the expanded territory nomenclature is racer's invention. It's racer's invention. That's terminology that's alien to the settlement agreement. It talks about a nexus relating to or in connection with. I'm sorry, Your Honor. I think you agree. Maybe I thought I heard it in the reservation of rights. That trumps the language about the scope of contribution. That trumps the covenant not to sue. So we need to look at  reservation of rights to anything other than properties or migration from that. Am I right that at the end of the day, all that other broad language might give us the gestalt, but the contract language we're interpreting is that? Your Honor, I think we do need to look at the reservation of rights. I think it's true in theory the reservation of rights could take away a big chunk of what is given in the covenant not to sue. But in fact, we don't believe that's a reasonable reading of the reservation of rights. Everything we're about to say in the covenant not to sue is subject to the reservation of rights. And that's true. If you look at the reservation of rights, isn't it symmetric with the covenant not to sue? And I think racers relying on a provision in the reservation of rights, that is the reservation of rights with respect to the debtors, which is a defined term that does not include racers. The sentence just before that section, this is still in paragraph 100, that racers are relying on, sets out the reservation of rights with respect to racers in particular, and it says it is symmetric. It says we reserve all rights with respect to anything that is not released in paragraph 94 to 98 of the agreement, and those are precisely the covenant not to sue agreement that include the provision resolving any liability that the government had served against GM. Can I ask another dumb question about the scope of the entire settlement agreement? This may be an empirical question, but I'll make it conceptual. There is a long list of properties, GM properties, that racer inherits the cleanup obligations for and gets a total sum of money to address those problems. Suppose, and I would guess there are some, but suppose there's another GM plant that everybody thought was squeaky clean, and no one realized that there was also pollution there. I take it the reservation of rights clause would mean that the government could sue about that property or about anything that emanated from that property, right? If that property was not one of the 89 properties and if the contamination issue didn't have a nexus with those properties, yeah. Doesn't that support, in a way, your argument about broadly interpreting, and maybe, I'm not sure your language will really bear this, but you're saying that what the covenants not to sue are essentially saying, the way you want us to read that, is it covers any property, not just  I'm interested in this agreement, with respect to anything that could have come from those properties, anything that emanates from those properties. I believe that is correct. I don't think the court has to reach the outer bounds of that interpretation on these facts, because racers counsel on that territory is separate from OU2. The government considers it to be part of OU2. The government on racers interpretation is proceeding unlawfully by requiring racers. Doesn't that require the resolution of, in effect, issues of fact, not necessarily facts about where the gunk came from that is on a particular spot, but doesn't that require us to address what, as a factual matter, what was intended by the settlement agreement, because it strikes me that it's fairly ambiguous. Yes, on the one hand, you could say you could read it broadly to mean anything connected to the sites at all, but at least by their interpretation, that only relates to things that actually did migrate, which they read as something less than have its original source once upon a time on the property. Your Honor, I don't think that's a tenable construction of the agreement. I think they're coming up with too strained and narrow an interpretation of migration. They're relying on language that, on its face, is inclusive and expansive. It starts with including. The question for us, then, is, is the agreement in that sense sufficiently clear that there is no issue of facts in respect to that, in which case a decision at dismissal stage is all right, or is it not? And if it is not, then there are factual questions, and if there are factual questions, then how far do they go? Because the problem with that is, you can say then there are factual questions in respect to expanded territories whether included or not, or you can say then there are factual questions in respect to you too, then there are factual questions in respect to everything in the agreement. And perhaps that means that the whole thing should be a summary judgment rather than a dismissal. But it is a summary judgment. I agree. Analytically, the question is what was the intent of the party with respect to the contamination at issue here? Did they intend it to be resolved by the 2011 agreement? And if the only reasonable interpretation of that agreement is that they did, then the district court's judgment should be affirmed. I'm trying to figure out whether the agreement is really ambiguous or whether it's the application of the agreement to the facts on the ground requires us to understand some facts. It seems to me viewing the reservation of rights as the critical provision, the agreement is very clear. It covers the properties that are on this list and anything that migrated from those properties. And I think the notion that migration encompasses loading stuff in a truck and taking it somewhere else and dumping it is untenable. That would be a stretch from my perspective. But that still doesn't answer what my question  I'm trying to understand the factual dispute here which is in part did in fact the area that the government is seeking to have  mediate become contaminated from one of those sites. Is there a dispute in your view about that factual question or it doesn't matter whether it migrated? I think both, John, I would say. I would say migration I think under the agreement includes not just what they consider to be direct migration but also any contamination resulting from releases from any portion of the property or any migration of contamination originating from the property. So if they loaded up a truck full of PCBs and offered it as free fill to members of the community, true story, I've seen it happen in other homes. And people build their yards and build their homes on it and some of those properties happen to be located on a north-south  Is it your view that those are within the scope of the settlement agreement here? I would concede there are hypotheticals where the degree of attenuation there would create a fact issue in terms of the intent of the parties as applying this agreement to that fact pattern but there is no such ambiguity here for several reasons. One is we've got the proof of claim and we've got the government alleging at the time the settlement agreement was entered that GM is responsible for contamination in the exact area that is described in paragraph 63 of the settlement agreement and says that in part some of the contamination is direct migration if not from the GM property from the dredging site which is also a property in the settlement agreement but some of the contamination the government said GM is responsible for because they released PCBs and in the 1970s long before the settlement agreement there was a well known flood control project in which the county spread them in the surrounding area. So we have the proof of claim which was resolved by the settlement agreement expressly and we have RACER's own admission that all the signatories knew at the time of the agreement because it was well documented in public documents that the area issue in this case was contaminated and that it was contaminated in part because of this flood control project. So RACER's argument at the end of the day is that all knew about the pathway and the fact that GM was responsible for that. They settled those allegations. There was no question that they gave up the allegations with respect to the properties. And that somehow at the end of the day the party didn't actually resolve that liability. The amount of money that was allocated to the downstream piece doesn't strike me as remotely proportionate to the notion that all of these people up and down the creek would be within the scope of the agreement to the extent that it was contaminated not through flowing down the creek but being dug up. Isn't that a factor as well? I don't think so your honor. What is dispositive of the circle of contribution analysis is the scope of the liability that was resolved not the amount of the settlement itself. It's not uncommon that you have sites that are identified as clean up and at the end of the day the amount of remediation is larger than people expected at the beginning. The point of having the contribution statute limitations triggered by the liability which clearly took place in 2011 and not a total liquidation of the amount of  that was allocated. What we are trying to say in this agreement was can't we look to the amount of monies that were allocated and say was it sensible to say what they call as the expanded territory. I know you say there's no difference but doesn't this tell us something about the limits of the agreement. You say no but isn't that a question that is at least potentially factual. I don't think so here because of all the evidence we have of intent with respect to known contamination in this very area that arrived via the pathways that racer is alleging. I think the only thing it tells us is that the parties allocated less of the full pot of money in the settlement allocated less money to the site than now appears to be needed but as Judge Lynch pointed out there's a multi-million dollar cushion fund in the settlement agreement that is there that's not allocated to a specific site and it's there precisely for these sorts of circumstances where it is determined that more money is needed to clean up a site and so that money can be drawn on pursuant to agreements between racer and the government and if necessary as mediated by the bankruptcy court but again at the end of the day the purpose of the settlement was to get as much money as could be drawn on    racer and the government and the government is responsible for because of its activities at these 89 sites and there's no question that the contamination at issue here fits firmly in that camp and I think as Judge Robinson pointed out from a practical standpoint racer's interpretation of the agreement where you have to look at each molecule of contamination in this upper lake creek area that we're talking about the area founded by the boundaries in paragraph 63 of the settlement agreement you have to look at each molecule and you have to litigate how that molecule arrived there. If it arrived via direct migration as racer understands it then they'd be absolved of liability but if it didn't then they wouldn't and they'd be open to contribution claims as well and that would not give them any realistic protection because you'd have to litigate that and that's what I think about the subsequent settlements. Now there's a certain amount of red herring stuff in the briefing I think about whether that resets the statute of limitations. It can't. It started to run. But does that tell us anything about what the parties thought they settled that later on they had to settle it all over again? No. The parties contemplated proceeding exactly as they have here. In 2011 we're saying to racer you get your liability resolved with respect to any contamination related to or connected with the properties and in exchange for that the debtors are going to fund you and then you are going to agree to clean up that contamination. But the specifics of that weren't spelled out in the agreement. They were left to be worked out later. The parties can enter into consent orders regarding that and the government can if there's no agreement unilaterally issue consent orders but it's got to be consistent with the terms of the 2011 settlement agreement. And of course that makes sense because racer is only responsible for doing the things that the agreement says it's responsible for. And that's the agreement that gives it all its funding. I see where it absolves racer of future liability. But where are the provisions that say here are the specific things you have to do? It's sort of broadly the beginning sections of the agreement. I wish I had one or two insights I could give you. I don't think I can do that. I think it's a little bit more of a multi-paragraph sketching out of the funding that's available and how racer will use that funding. Racer can only spend the money that it has. At the end of the day, in terms of fairness concerns, racer can't be on the hook for more than it's been funded with. It doesn't have an uncapped liability. Is the cap on racers required expenditures for remediation the amount allocated to the downstream or is it the amount in the entirety of the fund on a nationwide basis? Or is it something in between? The true maximum is the amount of total allocated funding. There are a fairly complex and comprehensive set of procedures for how you would resolve disputes if it is contended that more money is allocated for a particular site. There is an annual budgeting process for each site. There is a cushion fund that can be drawn on. There is no specific cap on what could be spent on any given site. Those estimates are just estimates that are then added up and given to them in the end. That lump sum is going to have to go for the entirety of GM's environmental problems nationwide. There is some process by which maybe there is a procedure that would limit how much goes to each site. That is not specified. The amounts estimated for the entire IFG plant is not capped by the amount of money that is in that estimate. The fact that the total amount is likely to be inadequate is nothing we can worry about in any particular case. I think it does not bear on the question. In terms of the issue that the judges observed, what the district court judgment means is that RACER does not have a contribution  it sat on it beyond three years after the agreement. We have a lot of defenses but one is not a time bar based on the case. The only question is whether when RACER entered into a settlement agreement which the government said we can get from GM to deal with all of its liabilities and connections we are going to release RACER from liability and that benefits all parties. It benefits the government because it means all of the money is available to fund cleanup and it benefits RACER because it receives contribution protection to the same extent of the scope of the agreement. That means that if any of the parties in the territories we could sue RACER. I think we would generally allow them to figure out what is good for them. I don't disagree. I simply think it points to the structure of the agreement. It also bears on why the existence of the section 113 forecloses the section 107 claim. When a party receives contribution protection they can't be given a 107 claim. I agree your honor. Appreciate your time. Thank you. I would like to address four points if I could. Can I just ask one question that has come up through the previous discussion. As a former district judge, one of the things I want to be thinking about is suppose you win in some sense that the whole complaint shouldn't be dismissed and it should go back for discovery. What actually are we instructing the judge to look at? In other words, there are perhaps questions of what the settlement agreement meant that would be addressed by addressing what the parties were thinking at the time or what the negotiations looked like. There would be factual questions about what migrated where. There might be questions about is that true with respect to OU2 and if so how is OU2 defined. It seems to me if we just say sorry you can't dismiss this complaint all together so you're wrong. Now go do what you got to do. That doesn't seem to me to give judge Hurd much in the way of instruction. So what would your actual language look like? What are you asking us to tell the district court to do? Ideally we would ask you to find that the 2011 agreement did not cover what is explicitly claimed in the reservation of rights. In other words the property and migration. Then there is as you point out a lot of ground. What does that mean? There would need to be some hearing regarding whether the material in these other areas are rightly separate different sites and whether there was migration in that sense of the word. So how that is determined. You may even hear from experts in the field that would interpret how they would naturally hear that language and whether there is really proper coverage. Even that alone you are talking about probably months if not years of discovery followed by a complicated trial as to how various molecules of contaminants that are affiliated with the site because the site used those particular contaminants. How they got from point A to point B. We envision even bringing this claim that that was going to come up. That would happen in a contribution action as it stands. You would have to figure out how to allocate potential responsibility. There would be some evaluation of whose waste is there, where it came from. That trial would be the kind of trial that would be required in the contribution claim actually has to be held at the basic stage of deciding whether the limitations began to occur. If you're going to say it's not migration, if it's limited to anything. If you don't go that far and you find it ambiguous and you send it back, there's a couple different layers. There would be some evaluation looking at extrinsic evidence about how you interpret this settlement agreement. One of the things that is an issue for us is that certain pieces of information but not others. For example, the trust agreement itself is not even examined. There would be extrinsic evidence about the intent of the parties. The second part of that, which I would put to you is the crux of the dispute anyway. Assuming that the only thing we bought from you was the expanded territories which they say you made up but that was there, what would you have us do if we agreed with you that the expanded territories   included in the agreement? We would ask that you vacate the decision and remand with direction that this agreement did not explicitly cover. We would then proceed to a determination regarding responsibility. Under section 107. The merits of the contribution claim would be then with respect to the expanded territories. How would we define the expanded territories as distinct from OU2? At this stage, you would take the allegations as they are pledged. Are you saying that we would order the district court to  that? Yes. And the conceptual definition of expanded territories is territories that were contaminated by means other than migration from a property. So we can say anything that's not migration from a property, yeah, you can bring a 107 claim. Because that wasn't resolved by the 2011. Anything that is migration from a property was resolved by 2011. Someone has to have a hearing to figure out where the boundary is between those. And you can bring your 107 claim with respect to it. That's right. That happens in cases where there are some issues that are outstanding and motions for summary judgment. So that's not even really about interpreting the contract at all. It's about applying the unambiguous language of the contract to the fact of this case. I agree with you. Very good argument by both sides. Appreciate it. Thank you both. Thank you.